UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ADELINE E. RICHARDS, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )  1:11-cv-00446-DBH |
| | ) |
| CITY OF BANGOR, MAINE, | ) |
| | ) |
| Defendant | ) |

**RECOMMENDED DECISION**

Adeline Richards commenced this civil action against her former employer, the City of

Bangor, alleging age- and disability-related discrimination, workplace harassment, and

constructive discharge.  Following her attorney's withdrawal from the action, Richards has

appeared in the case pro se.  Most recently, in October 2012, the District Court Judge cancelled

the Local Rule 56(h) conference and issued an order warning the plaintiff that she would be

required to file a response in accordance with the Local Rules when the defendant filed its

motion for summary judgment.  (ECF No. 38.)  As anticipated the defendant has moved for

summary judgment.  (ECF No. 42.)  Plaintiff did not respond to the motion.  It has now been

referred to me for a recommended decision.  Based on the undisputed facts before the Court, I

recommend that the Court grant the motion and enter judgment for the defendant.

**UNOPPOSED SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  By local rule, summary judgment facts are introduced by means of "a separate,

short, and concise statement of material facts," which statements must be supported by record

citations.  D. Me. Loc. R. 56(b), (c).  The Court's review of the record is most commonly guided

by the moving party's statement, the non-moving party's opposing statement, including any additional statement, and the moving party's limited reply statement.  D. Me. Loc. R. 56(b), (c), (d).  Appropriate record sources include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

Richards is entitled to have the summary judgment facts considered in the light most favorable to her cause.  Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011).  If the Court's review of the record reveals evidence sufficient to support a judgment in favor of Richards on one or more of the claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims.  Unsupported claims are properly dismissed.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

Although given the opportunity, Richards has not complied with District of Maine Local Rule 56 and has not set forth any facts in opposition to the defendant's statement of fact.  Hence, pursuant to Local Rule 56(f) all of those facts put forth by the defendant, when properly supported by record citations, are deemed admitted.  However, this court "may not automatically grant a motion for summary judgment simply because the opposing party failed to comply with a local rule requiring a response within a certain number of days."  NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7-8 (1st Cir. 2002).  Rather, the court must determine whether summary judgment is "appropriate," which means that it must assure itself that the moving party's submission shows that "there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); <u>see</u> <u>also</u> Advisory
Committee Note to Rule 56 ("Where the evidentiary matter in support of the motion does not
establish the absence of a genuine issue, summary judgment must be denied even if no opposing
evidentiary matter is presented.").

UNDISPUTED MATERIAL FACTS

Adeline Richards began her employment with the City of Bangor and the WIC program
(Women and Infant Children) in 1983.  The WIC program is a general assistance program.  Prior
to working for the City of Bangor, Ms. Richards worked for the Eastern Task Force on Aging as
the home-delivery meals coordinator for homebound clients.  Prior to that she was a CNA Home
Health Aide.  Richards's first position within the WIC program for the City of Bangor was as
check clerk and her duties and responsibilities were writing checks out to each client, setting up
appointments, and giving nutrition information.  After two years, Richards became the
receptionist for the WIC program and then she became the office coordinator.

In 2004, the City of Bangor hired Shawn Yardley to become the Director of Health and
Community Services, which includes WIC.  At that time Kim Harvey was the director of the
WIC program and Richards's duties as office coordinator were to assist Harvey by making sure
appointments were made and to continue seeing clients when needed.  Between 2004 and 2006,
approximately, Richards's position was reclassified to nutrition educator.  Prior to the
reclassification, which included an increase in pay, Richards was seeing clients along with
performing her office coordinator position.  Yardley was concerned that she was performing the
job as a nutrition educator and not being paid as much as the others in the office who were seeing
clients.  He spoke with Richards about reclassifying her so that she would be paid for the work
she was doing.  As part of  Yardley's restructuring of the department to improve efficiency, there

was a need for Richards to see more clients to fill in gaps and vacancies because the office coordinator work that she was doing became a duty of Kim Harvey once a new grant manager was hired.

In Yardley's opinion, Richards was qualified to perform the duties of a nutrition educator because she had been with the WIC department for so long and had been performing those duties already. Richards is a state certified nutrition counselor and lactation consultant. Yardley looked into whether an advanced degree was necessary for the reclassification to nutrition educator and determined that it was not because Richards had been seeing clients and providing nutrition education for many years.

The WIC Program is an ever-evolving program and new federal regulations can result in major changes in office procedures. According to Yardley, Richards had the same opportunities as everyone else to be exposed to and learn the procedures. WIC did quarterly training for all staff where they would block out the full day and do group trainings and group learning.

The WIC clinic is very busy, requiring that employees work quickly and efficiently, paying attention to detail. They must be able to operate complicated computer applications while providing appropriate education and benefits in a timely manner. The high case load requires that the team work well together and support one another to get the job done quickly and efficiently. Richards had the exact same training and opportunities that her co-workers had at the City of Bangor WIC Program.

Richards received her first performance evaluation from Kate Yerxa on February 2, 2007. In Yerxa's May 2007 evaluation, several of Richards's performance areas were reported as marginally satisfactory and below average. The evaluation noted some improved areas. An October 17, 2008, performance evaluation from Yerxa's successor also noted deficiencies in the quality of Richards's work.

4

Laura Honeycutt joined the WIC Program as Program Manager on February 11, 2008, following the resignation of Kate Yerxa in December 2007.  One of Honeycutt's responsibilities as the Program Manager was to monitor and evaluate the work performances of the employees in the Program.  Shortly after Honeycutt began working in the WIC Program, she developed the opinion that certain co-workers of Adeline Richards were intimidated by Richards.  Honeycutt also was of the opinion that Adeline Richards relied upon her co-workers to do her job.  It is said that Richards was constantly asking questions, sometimes the same questions over and over.  Beginning in early 2008, Adeline Richards began to make various sick leave requests and from time-to-time Honeycutt would receive copies of notes from Richards's physicians taking her out of work.  However, Honeycutt never received any detailed reports from any physicians outlining or otherwise discussing Richards's medical condition.

Honeycutt's experience in the department was that Richards's co-employees were very distraught over the disruption that her poor work performance was having on their ability to do their own jobs.  For several months there was not a day that went by that several employees would not come into her office to complain and beg her to intervene.  The situation became extremely stressful for Honeycutt to the point where she occasionally had to close the door to get work done due to the constant interruptions from staff coming to complain about Richards.  It was becoming all consuming.  Honeycutt asked Shawn Yardley for permission to have the staff write letters directly to the City Manager expressing their concerns to alleviate some of the pressure that they were exerting on her and to provide specific facts to the City Manager concerning the depth of the problem that Richards's performance was creating at the clinic.  The staff never expressed any concerns about other employees other than Richards.  Examples of daily complaints that Honeycutt received from WIC staff included the following:

(a) Charting and/or computer errors made by Richards at a previous appointment impacted their ability to do their appointment in a timely manner;

5

(b) Picking and choosing easier clients or taking too long with a client;

(c) Disturbing others by asking too many questions over and over;

(d) Interrupting co-workers to help her with the computer;

(e) Continued absences impacting their work load by having to absorb her case load;

(f) Informing Honeycutt of clients who complained about Richards or of giving clients misinformation;

(g) A specific co-worker complaining of being cornered by Adeline Richards in the parking lot in a threatening manner; and

(h) Continuous feelings of harassment by Adeline Richards.

Yardley testified that it was routine for Richards to come down and see him probably more than any other non-supervisory staff in the department and that Richards sought out more opportunities to meet with him about business than anybody else.

At no time did Honeycutt or Yardley ever receive any medical information from any doctor indicating that Adeline Richards had a "disability."  Besides Richards telling Honeycutt that she had vertigo, Honeycutt was not made aware of medical issues other than what was referenced in the out-of-work slips provided by the physicians.  At no time was Honeycutt ever aware of, nor did she ever consider Adeline Richards to have, a disability.  Richards never asked for any accommodations other than for time off for "medical reasons" and to attend doctor's appointments.

In May 2009, Richards made a request to take a 15-minute break every 45 minutes. Honeycutt, along with the Program Director, Shawn Yardley, informed Richards that, operationally, that would be impossible.  They informed Richards that as part of the job each counselor was required to get out of his or her seat at least two times during one appointment: (1) to occasionally do anthropometric screening (weigh and measure clients when clinic assistant is unavailable); (2) to get WIC checks and check registers from the central office; and (3) to have clients sign the register and return it to the central office, then check for the next client.  They noted that the average appointment length was 30 minutes; ranging between 15 and 60 minutes.  Occasionally, an appointment would

6

last 90 minutes.  Other than the request that Richards take a 15-minute break every 45 minutes, to the best of Honeycutt's knowledge and memory, each and every request that was ever made by Richards through her doctor or personally was honored.

There was also a time that Richards requested and was granted relief from driving beyond 15 miles.  Honeycutt does not have the exact date of this request.  However, to the extent that this could be considered a request for accommodation, it was granted.  Honeycutt never considered Richards unable to perform the essential functions of her job as they related to the physical aspects of the job. Richards demonstrated an extremely high error rate and inability to improve despite substantial guidance and training.  Some of the errors were critical in that inappropriate infant formula was issued and in one case a mother was turned away for services in order to hide an error by Richards – something Honeycutt considered inexcusable.  All of the errors were documented and the documentation is in Richards's personnel file.  On November 18, 2008, Richards met with Laura Honeycutt for a performance evaluation and a work plan was drafted and signed.

Yardley and Honeycutt were meeting with Richards for evaluations on a bi-weekly basis starting in December 2008 and they continued the bi-weekly meetings except when interrupted by Richards's extended absence as a result of family and medical leave and her suspension.  Every two weeks they reviewed Richards's performance, including the documents she filled out with clients, and provided her with feedback and an opportunity to explain or engage with them.  Following Richards's December 2008 evaluation, Richards refused to sign the document, because she didn't agree with it.  Following the December 19, 2008, evaluation with Laura Honeycutt, Richards called in sick every day for the rest of the month.  Richards did not follow Personnel Policy 7.10 Leaves of Absences when she did not inform Honeycutt that she was going to be out sick the week of December 22, 2008, following her Friday December 19, 2008, review.  Rather, she left messages with the receptionist.

At the January 9, 2009, performance bi-weekly evaluation with Honeycutt and Yardley, seven charts were reviewed and the work quality continued to be suboptimal and an additional critical error was noted. Meanwhile, co-workers continued to complain about disruptions and productivity problems cause by Richards's high error rate and interruptions asking for help. On January 9, 2009, Yardley and Honeycutt gave Richards a one-day suspension without pay on Thursday, January 15, 2009, pursuant to the City of Bangor Personnel Policy, page 25, § 6.82(a), for incompetence or inefficiency in her performance of her assigned duties. Richards received notice and an opportunity to appeal to the City of Bangor Director of Human Resources. The one-day suspension was given with the work plan noting: "further disciplinary action to follow if no significant improvement seen."

Richards was scheduled for a January 30, 2009, bi-weekly review with Honeycutt. However, she called in sick on January 28, 2009 (missing a 7.5 hour in-service training), January 29, 2009, and January 30, 2009. Following this absence, Richards never contacted Honeycutt. She took all of her personal belongings from her desk drawers and even a framed wall hanging when she left in January. This was all prior to receiving a fax from her physician dated January 30, 2009, indicating that she was to be out of work for "medical reasons" for two weeks.

Richards had no contact with Honeycutt or Yardley between January 30, 2009, and May 20, 2009, despite the fact that Richards received several certified mail letters from the City requesting updates on her status and plans for returning to work. Richards was not forthcoming and was, in Yardley's opinion, evasive in her communication around leave activities. When Richards returned to work on June 1, 2009, she was immediately suspended for 10 days for poor work performance that occurred prior to January 28, 2009, for the failure to keep the office notified in a timely fashion, and for ignoring certified letters Yardley sent to her requesting an update on her condition and return to work. Yardley testified that Richards's absence had nothing to do with the imposition of discipline

and that the decision to suspend her in June 2009 related to work performance prior to January 28, 2009.

The performance evaluations for Richards revealed 91 serious errors documented since September 2, 2008, six of which were critical enough on their own to warrant discipline.  In comparison, the next highest level of serious employee errors within the same timeframe was 17 for a receptionist.

Richards returned to work on June 15, 2009, and worked from June 15 to June 25, at which point she submitted her letter of resignation.  During this time, the City of Bangor complied with the recommendations of Richards's physicians.  As of June 25, 2009, although the City of Bangor did not intend to terminate Richards's employment, it was Honeycutt's personal opinion that Richards's employment should have been terminated for the reasons outlined in Honeycutt's letter to the City Manager dated May 28, 2009 (a copy of which is attached to Ms. Honeycutt's Affidavit as Exhibit B).  Honeycutt resigned from her employment with the City of Bangor in May 2011 after her husband obtained a job in Washington, D.C.  According to Honeycutt, Honeycutt would still be working for the City of Bangor WIC Program had she not moved to Maryland with her family.  At no time was Yardley made aware of any comments made by Honeycutt  regarding Richards's alleged disability or her age or any other alleged harassment or inappropriate and/or offensive remarks.  Richards never complained to Yardley about Honeycutt's alleged comments or alleged conduct towards her with respect to being harassed due to her age or disability.  Between June 15 and June 25, 2009, Richards never came to Yardley complaining about being harassed or otherwise treated unfairly by either co-workers or by Honeycutt.

Richards claims that the City of Bangor discriminated against her because of her age, and testified to the following examples of alleged discrimination:

> a. During a birthday celebration for a co-worker, another co-worker said there might not be enough candles when Richards's birthday came around.

9

b. Richards did not ask her supervisor Laura Honeycutt to disciple this co-worker for making that comment.

c. The same co-worker made an unspecified remark about Richards's age to a person fixing a telephone.

d. Richards went to Yardley about that comment and Yardley sent a memo about appropriate comments to the whole staff.

e. Another co-worker said, "Addie won't retire; she will keep working until her husband drags her out in a wheelchair."

f. Richards did not tell the coworker that she was offended by the comment and she did not mention it to Honeycutt.

g. Honeycutt made a remark about all the things Richards could do at her age.

Other than these comments, Richards could not remember any other comments anyone else said about her age.

Yardley never witnessed Honeycutt speak rudely to Richards in front of clients and Richards never came to Yardley to complain about Honeycutt speaking rudely to her in front of clients. Upon returning to work in June 2009, Richards continued to have performance issues. At no time prior to Richards's resigning in June 2009 did Yardley consider terminating her because she had been out on medical leave. Yardley was aware of the fact that Honeycutt wanted to terminate Richards's employment and that Honeycutt wrote letters to the City Manager advocating for her termination.

Yardley was also of the belief that Richards was not doing her job at an acceptable level. However, in his opinion, that does not necessarily mean that a person should be terminated because, in his experience, he has seen people turn around and be able to acclimate to a job and be very successful in the job. In Yardley's opinion, Richards had every opportunity to learn the job through the trainings that were made available, including from her peers and her supervisor. The strategy of discipline in the form of suspension was to let her know how serious it was and how unacceptable it was. In Yardley's opinion there were no additional trainings that he saw as being appropriate under the circumstances. According to Yardley, Richards's poor performance was ultimately a result of not

taking responsibility for her actions and consistently making excuses for why she did not do well, which Yardley did not feel were legitimate.  Yardley testified that Richards was not open to criticism and that she did not learn from her mistakes or take responsibility and improve.  Yardley testified that every one of his supervisors who supervised Richards came to him with concerns over the years because of her performance, but more importantly, because of her behavior.  Yardley  did not attempt to make it uncomfortable so that Ms. Richards would quit.

With respect to Laura Honeycutt's desire to terminate Adeline Richards's employment with the City of Bangor by writing a letter to the City Manager, Yardley advocated on behalf of Honeycutt with the City Manager and he also supported the City Manager's decision not to terminate and to go with the ten-day suspension.  As of the date of Richards's resignation, no decision had been made on her future employment with the City  other than the City Manager's refusal to accept Honeycutt's recommendation.  On June 25, 2009, Richards came into Yardley's office, handed him the written resignation, and walked out.  She did not state that she resigned because of the way people were treating her or that she could not take it there anymore.

## DISCUSSION

Currently pending before the Court are federal discrimination/retaliation claims under the ADA, the Rehabilitation Act, the ADEA, and the FMLA.  In order to prevail under one or more of these statutory schemes, Richards must have been subjected to adverse employment action by her employer due to a disability, her age, and/or as a result of taking medical leave.  Richards resigned from her position with the City on June 25, 2009, and the City maintains that her resignation was not a constructive discharge.  The City also maintains that the undisputed facts show that despite the numerous documented critical errors and inability to perform the essential functions of a nutrition educator for the WIC program, the City decided not to terminate Richards and to continue to work with her to improve her work performance.  The City asserts that any suspensions or other adverse

employment actions taken prior to her resignation were legitimately imposed disciplinary measures caused by Richards's own work performance deficiencies.

**A.      The Constructive Discharge Theory**

In paragraph 15 of the amended complaint, before setting forth her claims by count, Richards alleges that she was compelled to resign in light of workplace conditions imposed on her.  (Am. Complaint, ECF No. 5-5.)  A "constructive discharge" occurs when an employer, through illegal employment practices, imposes working conditions so intolerable that a reasonable person would feel compelled to leave a job rather than submit to them.  Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 36 (1st Cir. 2001).  To prove a constructive discharge in the context of an age discrimination claim based upon what a plaintiff views as hurtful or mean-spirited comments in the workplace, a plaintiff needs more than "bland proof."  Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 56 (1st Cir. 2000).  "The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins—thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world."  Id. at 54.  The present record, consisting solely of the comments and actions selected by the City as possibly being the basis of Richards's claim, does not describe an intolerable work environment.  The City of Bangor is entitled to judgment in its favor on the claim of constructive discharge not only in the context of the age discrimination count, but also in regard to the other claims.[1]

**B.      Count I**

The Court previously dismissed count I, a state law claim asserted under the Maine Human Rights Act.  (See ECF Nos. 19, 23.)

---

[1]     Additionally, the present record is devoid of any evidence regarding the nature of any disability under the ADA or the Rehabilitation Act.  The Family Medical Leave Act claim is discussed in the body of this recommendation.

**C.      Count II—Age Discrimination**

To establish a trial-worthy claim of age discrimination, Richards must ultimately present evidence that would permit the finder of fact to conclude that she was subjected to adverse employment actions based on a bias against her because of her age.  Torrech-Hernandez v. GE, 519 F.3d 41, 48 (1st Cir. 2008) (involving ADEA claim).  Here, the City has presented evidence, undisputed by Richards, that it had legitimate reasons for imposing discipline it imposed and that these decisions were not motivated by age-based animus.  Accordingly, the City is entitled to summary judgment on the age discrimination claim asserted in count II.

**D.      Count III**

The amended complaint omits count III.

**E.      Count IV**

The Court previously dismissed count IV, a state law claim asserted under the Maine Human Rights Act.  (See ECF Nos. 19, 23.)

**F.      Count V and VI—Disability Discrimination**

Similar to her claim of age discrimination, Richards's disability discrimination claim requires that she present evidence sufficient to enable the finder of fact to conclude that she was subjected to adverse employment actions due to her disability.  Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004) (involving Rehabilitation Act claim); Marcano-Rivera v. Pueblo Int'l, Inc., 232 F.3d 245, 251-52 (1st Cir. 2000) (involving ADEA claim).  For reasons already outlined in relation to the claim of age discrimination, Richards has failed to generate a triable issue of discriminatory animus because she has failed to controvert the City's legitimate explanations and its representations that its actions were not based on discriminatory animus.

G.      **Count VII—FMLA Discrimination**

The Family Medical Leave Act entitles eligible employees to take, for specific medical reasons, reasonable leave up to a maximum of twelve weeks, and then to return to the same or an alternative position with some equivalency.  See Hodgens v. General Dynamic Corp, 144 F.3d 151, 159;  29 U.S.C. §§ 2612(a)(1)(D), 2614(a)(1).  The Act also prohibits employers from retaliating against employees for exercising their statutory rights.  See 29 U.S.C. § 2615(a).  Thus, an employer cannot regard the taking of FMLA leave as a negative factor in deciding to terminate an employee. See 29 C.F.R. § 825.220(c);  Mellen v. Trustees of Boston Univ., 504 F.3d 21, 26-27 (1st Cir. 2007). Of course in the present case Richards was neither terminated nor was she constructively discharged.

The sole possible argument Richards might make is that the ten-day suspension imposed upon her in June 2009 upon her return to work was done in retaliation for her four month leave of absence for medical reasons.  Richards had not been at work since January 28, 2009, and the record evidence supports the factual finding that the disciplinary sanction was imposed based upon prior poor work procedures and Richards's failure to comply with applicable policies regarding her extended absence for medical reasons.  The employer, at that point in time, had made a conscious decision not to terminate Richards, to allow her to return to the same position she held before, and to work with her to overcome serious perceived deficiencies in her performance.  There was no FMLA violation on these facts.

CONCLUSION

Based upon the foregoing I recommend that the Court grant the motion for summary judgment and enter judgment for the defendant.


NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to

14

28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

December 11, 2012                    /s/ Margaret J. Kravchuk
                                     U.S. Magistrate Judge